**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cr-20219-TLP |
| v. | ) | |
| | ) | |
| CHRISTOPHER YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED ORDER ON MOTION TO SUPPRESS

Defendant moved to suppress all evidence seized at the time of his arrest.  (ECF No. 28.)  The government responded in opposition.  (ECF No. 31.)  So the Court held an evidentiary hearing on the motion on February 23, 2024.  (ECF No. 32.)

During the hearing, the Government called two officers, Jacques Louis Roberts ("Roberts") and Cameron Jones ("Jones").  Roberts worked for the Memphis Police Department ("MPD") from 2018 through 2023 as a patrol officer in the Mt. Moriah Station.  He is currently employed by the Tennessee Highway Patrol.  Jones is a patrol officer with the MPD.  Defendant called his mother, DeBorah Minnis, to testify.

## BACKGROUND

### I.      Roberts Notices and Follows the Corvette

. On December 9, 2021, Roberts was patrolling in Southeast Memphis in an unmarked car.  Roberts was driving on Cottonwood Street near Brandale Street in Memphis, when he noticed a black Corvette with a temporary tag.  He immediately thought the tag was fake.  He noticed that it was the wrong size, it had been laminated, the state seal was not a hologram, the

number for the license plate began with the letter "P", and it expired on October 14, 2021. Because all temporary tags in Tennessee start with the letter "Q", Roberts knew that the temporary license plate on the Corvette was fraudulent.

Roberts also noticed that the car had a flat black appearance and that it was "wrapped." A "wrap" is a vinyl coating that covers a car so that the original color of the car is not seen. Roberts explained that, in his experience, people "wrap" a stolen car to reduce the chances of it being found. Roberts radioed other officers to run the tag and determine whether the vehicle was stolen.

While he was following the car, he noticed that it crossed a double yellow line to pass other cars. He tried to stay close to the Corvette. Roberts drove up to 50 miles per hour in a 35 mile per hour zone and the Corvette was going faster. He also noted that the windows were tinted beyond what is allowed in Tennessee. And so he followed the car to an area near Navaho Street. Because he was in an unmarked car, Roberts did not conduct a traffic stop, and because his car was not equipped with lights and a siren. Instead, Roberts stopped at the end of Navaho and waited for his colleagues from the Mt. Moriah Station to arrive in their marked vehicles.

Officer Cameron Jones was a patrol officer also assigned to the Mt. Moriah Station. He responded to Officer Roberts' request for assistance. When he reached the end of Navaho, Roberts and Jones saw that the Corvette was parked in a driveway on Navaho Street. They also saw two cars in the street, with men standing outside those cars, talking. When the Corvette pulled into the driveway on Navaho, Roberts drove around the block and then parked at the end of Navaho, waiting for Officer Jones. Officer Jones also came to the end of Navaho and waited a short time before approaching the Corvette.

2

On cross-examination, Roberts noted that, when he was following the Corvette, it was dark outside.  He followed the Corvette to Navaho Street, but he could not see who was driving.  He agreed that he made the block before parking at the end of Navaho at the intersection with Watson Street.  He also said that there was a Cadillac CTS with another car in the street.  It took Officer Jones a few minutes to arrive after Roberts stopped at the end of the street.  He also testified that he saw men on the street, talking, and he also agreed that he did not see the Defendant drop anything.

## II.    Officers Jones' Arrival

The Government called MPD Officer Cameron Jones to testify.  Officer Jones is a patrol officer assigned to the Mt. Moriah Station.  On December 9, 2021, he was patrolling in a marked squad car.  He recalled the evening when Officer Roberts radioed about the black Corvette, and he echoed Roberts' testimony that the temporary license tag on the back of the vehicle was fraudulent.  The MPD ran the tag number and found that it came back "not to be found," meaning that the license plate was not assigned to any vehicle in Tennessee.  That confirmed that the tag was, in fact, fraudulent.

Officer Jones went to the end of Navaho Street where it intersects with Watson Street.  He parked and waited for Officer Lampley to arrive.  Officer Lampley was also in a marked squad car.  Officer Jones was on the north side of the intersection.  He said that he saw someone get out of the Corvette and walk over to speak with the other two men on the street.

Officer Jones then engaged his blue lights, drove down Navaho, and parked at an angle behind the Corvette to prevent it from leaving.  As he got out, he noticed that the Corvette was still running, and the headlights were on.  He also noticed two men standing near or between the

two cars on the street, and then a third male on the other side of those two vehicles.  He asked the group who was driving or who owned the Corvette.

He noticed that the man on the other side of the cars, later known to be Defendant, backpedaled and then started running as Officer Jones spoke with the other two men. Defendant was about 40 feet away from Officer Jones when he started running.  When Defendant took off running, Officer Jones chased him.  The Government showed Officer Jones' body camera footage of the chase.  The Court noted that the chase began about 15 seconds after Officer Jones got out of his squad car.  The sound on the body camera had not yet engaged.

Officer Jones chased the Defendant and can be heard telling him to "give it up", and the Defendant continues to run.  Finally, Officer Jones tackled the Defendant near a concrete patio behind the house at 4061 Navaho.  The Defendant was face-down on the ground with Officer Jones on top of him, telling him to put his hands behind his back.  Defendant refused to comply but kept asking what was going on.  Officer Jones is heard radioing for assistance.  Defendant refused to put his hands behind his back for about three minutes.  Officer Jones noted this and said that it raised his suspicions of Defendant.  He later went back to look to see if Defendant dropped anything.

Finally, Officer Jones's partner, Officer Lampley, came to assist.  Lampley hit Defendant with a taser, and Defendant finally put his hands behind his back.  The officers cuffed him and walked back toward the Corvette.  After walking Defendant back to the car, the officers began to search him before putting him in the back of the squad car.  Defendant was carrying a Glock firearm with a switch attachment and in his pockets was about $11,000 in cash, and the key to the Corvette.  A few minutes after placing Defendant in the back of the squad car, Officer Jones and his partners began to retrace their steps because they thought the Defendant might have

4

dropped something.  That Defendant had a gun and a large amount of money suggested that there could be other guns or drugs nearby.

Behind the house, located at 4061 Navaho, the Officers found a red or orange bottle with liquid, along with a baggie containing a white substance.  At the time of the arrest, the officers field tested the substance, and it was positive for cocaine.  Then, a laboratory test revealed that it is, in fact, fentanyl.

The Government introduced the arrest ticket and affidavit of complaint as exhibits.  The arrest ticket listed about ten violations of Tennessee law, including the vehicle registration law, reckless driving, drug charges and felon in possession of a firearm, and related charges.

Officer Jones testified that he has a tint meter that showed on the Corvette that the tint would allow 0% of light through, a violation of Tennessee law.  Tennessee requires 35% and above.

On cross-examination, Officer Jones testified that he pulled behind Roberts, to the north on Watson, and was able to see the driveway on Navaho where the Corvette had parked.  He also agreed that he saw two other vehicles in the street, one was a Cadillac CTS and the other turned out to be a white Mercedes.  After watching for a couple of minutes, Officer Jones repositioned, and he said he "looped around" and waited for Officer Lampley to get there.

He saw two people in the street talking and a third person who walked away from the Corvette to join them.  When he headed toward them, there were three people talking in the street near the Cadillac CTS.  When he pulled up, Officer Jones' car pulled passed the CTS and parked at an angle at the end of the driveway behind the Corvette.  As Officer Jones got out of his car, Defendant was now on the other side of the CTS and the Mercedes.

As he got out of his car, he agreed that no one was detained or arrested when he first arrived. He did not activate his body camera until Defendant took off running.[1] On the arrest ticket, Officer Jones referred to this as a "traffic stop." Officer Jones testified that that is exactly what it was. When he pulled behind the Corvette, the Corvette was not allowed to continue until the traffic stop was over with. Officer Jones agreed that he did not see Defendant throw anything while they were running. In his affidavit, Officer Jones said he "observed that the defendant had dropped a plastic bag and bottle," because he went back minutes later when he retraced his steps and found what the Defendant allegedly dropped.

## III.    DeBorah Minnis' Security Camera

Defendant then called his mother, DeBorah Minnis, to testify. Ms. Minnis lives on Navaho Street at 4085 Navaho. She owns a house directly across the street from where the Corvette was parked. Her house is equipped with motion-activated security cameras. She is a retired MPD clerk where she worked for around fifteen years. Ms. Minnis gave defense counsel video footage from her security cameras. The footage shows part of the events on December 9, 2021. For example, the video footage begins with Defendant standing among the other two men near the CTS and Mercedes in the street on Navaho. The Corvette is already in the driveway, but Officer Jones has not yet arrived.

A second video shows Officer Jones arrive. Like Jones' body camera footage, Minnis' video shows Jones get out of his squad car, and, within seconds, it shows Defendant sprinting away from the scene. Officer Jones immediately takes off after Defendant. In fact, the video

---

[1] The body cameras used by the Memphis Police Department automatically capture one minute of video footage before the body camera is engaged. During that minute, there is no audio.

shows Defendant backing up as Officer Jones stops his car.  By the time Officer Jones gets out of his car, Defendant is about 30-40 feet away on the other side of the two cars in the street.

Ms. Minnis did not provide any footage of the Corvette as it pulls up and into the driveway, and we do not see footage of Defendant joining the other two.  Interestingly, Ms. Minnis said that those are the only videos that the cameras captured of these events.  But the Court finds this doubtful.  If the video camera engaged based on the movement of the men walking in the street and talking near the CTS and Mercedes, surely the movement of the Corvette pulling into the driveway near the CTS would have activated her cameras.  And the Court notes that Defendant did not produce that video footage.[2]

## IV.   Closing Argument

At the hearing's conclusion, Defendant did not focus on the reasons for the "traffic stop." Instead, he centered on how long it took Officer Jones to arrive on the scene.  Defendant points out that Ms. Minnis' video shows Defendant walking around with the other men for about 4 minutes before Officer Jones arrives.[3]  He alleges that, when Officer Jones's claims to have seen Defendant walk away from the Corvette, he lacks credibility.[4]  Defendant asserts that the video footage from Ms. Minnis would have shown Defendant get out of the Corvette were Officer Jones' testimony true.

---

[2] There are at least two reasons why the Court believes Officer Jones' testimony that he saw Defendant get out of the Corvette and join the other men in the street.  First, Defendant did not show video footage of anyone else getting out of the Corvette and, second, when officers searched Defendant, they found the key to the Corvette in his pocket.

[3] The Government disputes how much time passed before Office Jones arrived.

[4] Frankly, Defendant's position about Officer Jones' credibility and how long in Minnis' video is unclear.  His argument that Officer Jones' credibility is unpersuasive.  For all that, the Court finds that Officer Jones' testimony is credible with ample corroboration in the record.

The Government counters that the officers had probable cause to stop the car for the fraudulent license plate and they had reason to believe the car was stolen.  When Officer Jones stopped his vehicle behind the Corvette, the Government argues that he needed to find out who was driving the car.  So he properly asked who was driving.  And, within seconds, Defendant took off running.  Under those circumstances, according to the Government, Officer Jones properly gave chase and made a proper *Terry* stop.

## LEGAL STANDARD

To begin this analysis, the Court recounts the Fourth Amendment legal standard.  The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ."  U.S. CONST. amend. IV.  "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Jackson,* 682 F.3d 448, 453 (6th Cir. 2012) (quoting *United States v. Blair,* 524 F.3d 740, 748 (6th Cir. 2008)); *see also Delaware v. Prouse,* 440 U.S. 648, 653 (1979).  Any evidence obtained during an illegal traffic stop must ordinarily be suppressed as fruit of the poisonous tree.  *Jackson,* 682 F.3d at 453; *see also Wong Sun v. United States,* 371 U.S. 471, 484 (1963).

Whether a warrantless encounter violates the Fourth Amendment turns on the "totality of the circumstances."  *See Sheckles*, 996 F.3d at 337, 343.  "When deciding whether [a] fair probability [of criminal activity] exists, courts must view the totality of the circumstances through the common-sense lens of ordinary people, not the technical lens of trained lawyers." *Id.* at 337 (citing *Christian*, 925 F.3d at 309–11).  The same holds true when analyzing reasonable suspicion, which "requires less than the 'probability or substantial chance of criminal activity' necessary for probable cause."  *Id.* at 343 (quoting *Wesby*, 138 S. Ct. at 586).  "To

determine whether a particular stop is permissible under the Fourth Amendment, a court must look at the 'totality of the circumstances' of [the] case to see whether the detaining officer has a 'particularized and objective' basis for suspecting legal wrongdoing." *Pearce*, 531 F.3d at 380 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

If law enforcement violates the Fourth Amendment in an encounter, incriminating evidence discovered during that encounter may be inadmissible under the "fruits of the poisonous tree" doctrine, "which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Id.* at 381 (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).  With this in mind, the Court will address the motion.

## ANALYSIS

### I.      Validity of Traffic Stops

The Sixth Circuit has developed two tests to analyze the validity of traffic stops: (1) whether an officer has probable cause to make a stop for a civil infraction, and (2) whether the officer has reasonable suspicion of an ongoing crime to make a stop for a criminal violation. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) ("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity."); *see also Blair,* 524 F.3d at 748; *Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n. 6 (6th Cir. 2004); *United States v. Tullock,* 578 F. App'x 510, 513 (6th Cir. 2014).

#### A.      Probable Cause Standard in a Traffic Violation

When a stop is based on a "civil infraction," courts must determine whether the officer had probable cause to pullover the driver.  *See Lyons*, 687 F.3d at 763.  Many states and every Sixth Circuit opinion on this subject of which this Court is aware consider traffic violations "civil infractions."  To require an officer to have probable cause of traffic violations before

making a stop on that basis makes logical sense because it seems that those violations are readily observable, such as speeding, running a stop sign, or crossing the center line. *See, e.g., State v. Smith*, 484 S.W.3d 393, 400–01 (Tenn. 2016) (explaining that officers need probable cause to pull over a driver for violating "traffic statutes [that] create offenses which render it simple for an officer to determine whether a motorist has committed a violation" such as running a stop sign or speeding).

That said, when no explicit traffic violation has occurred, officers may still conduct an investigatory stop of a car if they have reasonable suspicion of an ongoing crime. *See Lyons*, 687 F.3d at 763; *see also Gaddis*, 364 F.3d at 771 n. 6 ("Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense." (citations omitted)).

### B.    Application of the Probable Cause Standard

Courts, both in the Sixth Circuit and Tennessee, have consistently applied the probable cause standard to any traffic violation. But the Court notes some inconsistency because some traffic violations in Tennessee are in fact criminal offenses, even though generally only considered misdemeanors. For example, a violation of the Tennessee stop sign statute is a misdemeanor offense. *See* Tenn. Code Ann. § 55-8-149(c). The Tennessee Supreme Court explained in *State v. Davis*, 484 S.W.3d 138, 147 (Tenn. 2016), that Tennessee criminalizes common driving infractions such as crossing the center lane line, a violation of Tenn. Code Ann. § 55-8-115. Because Roberts saw the Corvette speeding and cross the double yellow line, one could argue that the correct standard here is reasonable suspicion.

Regardless of the Sixth Circuit's explicit statement in *Lyon* that probable cause applies to civil infractions, the Tennessee Supreme Court in *Davis*, as well as many other federal and state courts interpreting similar traffic violations, applied the probable cause standard to these Tennessee criminal traffic violations. *See, e.g., United States v. Braswell*, 704 F. App'x 528, 531 (6th Cir. 2017) (applying probable cause standard to a stop for driving without headlights and running a stop sign).

With this in mind,[5] the Court will determine whether Roberts—and by extension Officer Jones[6]—had either probable cause or reasonable suspicion. Under either standard, the Court's conclusion is the same. Jones made a proper traffic stop when he pulled behind the Corvette in the driveway on Navaho Street.

---

[5] The Sixth Circuit in *United States v. Sanford* also pointed out the same discrepancy mentioned here. That court found,

> [t]he suspected violation in the present case is a misdemeanor traffic offense in violation of Tenn. Code Ann. § 55-8-124 and, therefore, by application of *Gaddis*, the stop should be analyzed under the standard of reasonable suspicion rather than probable cause. However, because we conclude that [the officer] had probable cause to stop [the defendant] for a traffic violation, it is unnecessary for us to resolve this issue between the reasonable suspicion and probable cause standards at this time.

476 3d 391, 395 (6th Cir. 2007).

[6] The collective-knowledge doctrine permits an officer to "conduct a stop based on information obtained from fellow officers." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015). Because police officers "must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information, we impute collective knowledge among multiple law enforcement agencies." *United States v. Lyons*, 687 F.3d 754, 766 (quoting *United States v. Hensley*, 469 U.S. 221, 230–31 (1985)). Police officers, in assessing probable cause, can use the collective knowledge of other officers. *Bauman v. Millisor,* 2022 WL 35470, at *3 (6th Cir. Jan. 4, 2022) (citing *Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019). Courts look to the "collective knowledge of [officers] working as a team ... in determining probable cause," so long as there is evidence that the officers communicated the relevant information among themselves. *United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (citation omitted).

II.     **Officer Jones Had Probable Cause to Stop the Corvette**

Probable cause is present if the officer has reasonable grounds, based on what they knew, to believe that a traffic violation has occurred. *See* United States v. *Tullock*, 578 F. App'x 510, 513 (6th Cir. 2014) (noting that the probable cause test is whether the officer had an "objectively verifiable reason" to pull the car over). Probable cause, of course, is a higher bar than reasonable suspicion.

Reasonable suspicion requires "more than a mere hunch but is satisfied by a likelihood of criminal activity less than probable cause and falls considerably short of satisfying a preponderance of the evidence standard." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (citation omitted). An officer generally needs "a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts." *Id.*

This Court finds that when Officer Jones pulled into the driveway behind the Corvette on Navaho Street, he had probable cause to stop that car for civil violations or misdemeanor traffic infractions including vehicle registration, speeding and crossing the center line. He also had reasonable suspicion to believe the car was stolen based on the fake license tag and the "wrap" that concealed the car's original paint color. Either way, the officer's decision to stop the car was proper. Now the question is whether he could chase Defendant.

III.    **Officer Jones Had Reason to Chase and Seize Defendant**

A.      **Terry Stop Standard**

Law-enforcement officers may conduct brief but forcible investigatory stops short of a full arrest, if the stops are supported by reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *United States v. Place*, 462 U.S. 696, 702 (1983). To initiate a *Terry* stop, an officer must have "reasonable, articulable suspicion that a person has been, is, or is about to

be engaged in criminal activity." *Srisavath v. City of Brentwood,* 243 F. App'x 909, 913 (6th

Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)).

This reasonable suspicion standard "requires more than a police officer's hunch that

criminal activity is afoot." *Srisavath v. City of Brentwood*, 243 F. App'x 909, 913 (6th Cir. 2007)


Instead, the officer must be able to point to 'specific and articulable facts that, taken

together with rational inferences from those facts, reasonably warrant that intrusion. *See Terry v.*

*Ohio*, 392 U.S. 1, 21 (1968).  In determining whether reasonable suspicion existed for a stop,

courts consider the totality of the circumstances. *See United States v. Cortez,* 449 U.S. 411, 417–

18 (1981).

### B.      **Flight Can Contribute to Reasonable Suspicion**

"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."

*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted).  Though it is true that during a

"consensual conversation with an inquisitive officer," one has the right to simply walk away.

*See Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001).  And "refusal to

cooperate, without more, does not furnish the minimal level of objective justification needed for

a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citations omitted).

But the situation changes when suspicious conduct accompanies otherwise innocent

behavior.  *See United States* v. *Smith*, 263 F.3d 571, 593 (6th Cir. 2001) (holding that while

"perfectly innocent behavior" is alone insufficient to provide reasonable suspicion, such behavior

may contribute to reasonable suspicion when combined with other factors).  And when

considering whether the alleged circumstances support reasonable suspicion, courts do not view

those circumstances separately in isolation, but as a "unified whole." *United States v. Davis,*

2021 WL 223385, at *3 (W.D. Tenn. Jan. 22, 2021) (citing *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012).

While the Sixth Circuit has found that "reasonable suspicion ... cannot be based on events that occur after the defendant is seized," *United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010), the situation changes when officers have reasonable suspicion of wrongdoing before the suspect flees. *See e.g., United States v. Bloodworth*, 798 F. App'x 842, 849 (6th Cir. 2019).

### C.    The Pursuit and Seizure of Defendant was Reasonable

The Court finds that Officer Jones properly blocked the Corvette in the driveway for the reasons stated.  He already saw the driver exit the Corvette and join the other men in the street. To learn who was driving the Corvette, he simply asked the question: who was driving the Corvette or who owns the Corvette.  Within 15 seconds of his stepping out of his squad car, Defendant took off running.  Under the totality of circumstances, Defendant's headlong flight added to Officer Jones' suspicion.  Officer Jones therefore had good reason to give chase. Because Officer Jones had reason to believe that the Corvette was stolen, Defendant's flight made him conclude that Defendant was responsible for it.  In other words, when Defendant took off, Officer Jones reasonably concluded that criminal activity was afoot.

Because he had reason to chase Defendant, he also had reason to detain him once he caught him.  Defendant's behavior at his arrest (failing to put his hands behind his back for about three minutes, for example) also gave Officer Jones reason to back track to see whether Defendant threw something while he was running, or while they were wrestling.  In the end, Defendant's motion to suppress lacks merit.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion to Suppress is **DENIED.**

**SO ORDERED**, this 1st day of March, 2024.

    s/Thomas L. Parker
_____
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE